[Civil No. 3354. Filed January 29, 1934.]

[29 Pac. (2d) 144:]

UNITED FARMERS' CITY MARKET, INC., a Corporation, Appellant, v. CHARLES DONOFRIO, as Executor of the Last Will and Testament of HANNAH MARGUERITE DONOFRIO, Deceased, CHARLES DONOFRIO, D. A. DONOFRIO and CLARA ZUNKLE DONOFRIO, His Wife, Appellees.

36

Mr. R. G. Langmade and Mr. V. R. Seed, for Appellant.

Mr. Thos. J. Prescott and Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellees.

LOCKWOOD, J.—Charles Donofrio and Hannah Marguerite Donofrio, his wife, D. A. Donofrio and Clara Zunkle Donofrio, his wife, hereinafter called plaintiffs, brought suit against United Farmers' City Market, Inc., a corporation, hereinafter called defendant, to quiet title to certain real estate situated in Maricopa county, Arizona. Defendant answered, and, a demurrer to the answer having been sustained with leave to amend, filed an amended answer and cross-complaint, which were also demurred to, and, this

demurrer also being sustained, defendant elected to stand on its amended answer and cross-complaint, and judgment was rendered in favor of plaintiffs, whereupon this appeal was taken.

There is but one question before us, and that is whether the answer sets up a defense. For the purpose of the demurrer we must, of course, accept its allegations as being true. Leaving out formal matters, they may be stated in a narrative form as follows: In June, 1927, the plaintiffs entered into a contract with certain parties, whose rights afterwards passed by mesne conveyances to defendant, which reads, so far as material for the consideration of the matters involved in this appeal, as follows:

"Lease with Option to Purchase

"Know all men by these presents: That Charles Donofrio and Hannah Marguerite Donofrio, his wife, of Phoenix, Arizona, and D. A. Donofrio and Clara Zunkle Donofrio, his wife, lessors, have this day demised and let unto P. Dickerson and William P. McNeley, of Phoenix, Arizona, lessees, the following described real estate, situate in the County of Maricopa, State of Arizona, to-wit. . . .

"For a term of ten (10) years, commencing on the date of the execution of these presents, at a total rental of the sum of thirty-eight thousand two hundred thirty-two and 50/100 ($38,232.50) dollars. . . . and, in addition thereto, and as a part of the rent to be paid for said premises, the payment, when due and payable, of all taxes and assessments becoming due and payable on said premises from and after the execution of these presents, during the life of this lease. . . .

"(2) That the lessees herein are to have possession of said leased premises and retain possession thereof with the right to sub-let or sub-lease the same, or any part thereof, and to assign any interest or interests they may have in this lease to said above described premises, so long as they shall make the payments herein required by them to be made to the lessors, and in addition thereto, shall have paid, as

and when due and payable, all assessments and taxes that shall become liens or charges upon said leased premises, from and after the execution of these presents, and upon their having complied with all of the conditions and stipulations herein on their part to be performed.

"(3) It is mutually understood and agreed that the leased premises are demised for the purpose, principally, of carrying on a general market by the lessees for the purpose of the sale of produce and food stuffs, but the right to carry on any other lawful retail or wholesale business thereon is not intended to be restricted hereby.

"(4) That all improvements on said premises made by lessees shall be paid for by lessees, and lessors shall not be liable for any of the cost for any improvements placed upon said premises, and that said improvements, if any; placed upon said premises, shall be and remain the property of the lessors, and said lessees shall in all respects comply with the ordinances of the city of Phoenix relating to the construction of buildings.

"(5) It is understood and agreed between lessors and lessees herein that in the event of violation of any of the terms or conditions hereof, by lessees or upon lessees' failure to perform any or all of the conditions herein specified, then and in either of said events, and without previous notice or demand, this lease shall, at the option of the lessors, be forfeited, and the lessees shall, upon such failure, forfeit and lose all right, title and interest in and to said lease and said real estate and the right to use or occupy the same, and the right to exercise the option to purchase herein given shall thereupon, at the election of the lessors, be terminated and lost to the lessees, and lessees' possession of said real estate, from and after such failure, shall be unlawful and without right, but they may be expelled at any time after such forfeiture of this lease.

"(6) In consideration of the covenants and agreements herein contained on the part of the lessees herein to be by them kept and performed, the lessors hereby grant and give to lessees herein the right and option at any time within thirty (30) months

from and after the date of the execution of these presents, to purchase the above described real property from lessors at and for the sum of fifty-seven thousand ($57,000.00) dollars, that is to say, payment of seventeen thousand ($17,000.00) dollars on or before thirty (30) months from the date of the execution of this lease and option, and the balance of forty thousand ($40,000.00) dollars on or before ten (10) years from the date hereof, with interest at the rate of 7% per annum, interest payable monthly, commencing on the first day of the month following the date of the $17,000.00 option money payment, which monthly interest payments, in the event this option is exercised by the lessees, shall be in lieu of the monthly rental hereinabove provided to be paid of three hundred thirty-two and 50/100 ($332.50) dollars; provided, however, the full amount of fifty-seven thousand ($57,000.00) dollars, together with interest on the unpaid balance at the rate of 7% per annum, interest payable monthly as aforesaid, shall be fully paid between the date of lessees' exercising this option and ten years from the date hereof.

"And further provided that this option shall be null and void if said lessees and optionees shall fail or refuse to carry out each and all of the covenants, stipulations and agreements on their part herein required of them to be kept and performed.

"(7) It is further specifically understood and agreed that in the event the lessees shall exercise the option provided for herein, they shall have the right to sub-let and sub-lease or assign any interest or interests they may have in said property by virtue of this lease so long as they shall comply with the terms of this lease and option, on their part herein required to be kept and performed.

"(8) In the event said lessees shall exercise this option to purchase said real estate, and fully pay the purchase price thereof as aforesaid, together with the amounts of taxes and assessments as and when the same shall become due and payable, then the lessors hereby bind themselves, their heirs, executors, administrators, and assigns, to convey to said lessees the above described premises so purchased, by a general warranty deed in fee simple, subject to taxes

and assessments then due against said premises. . . . "

It was understood by all the parties that it was the intention of the original grantees in said contract to organize a corporation for the purpose of erecting a large public market on the land, and, in pursuance of such agreement, the defendant corporation was formed, and in August, 1928, and within the thirty months referred to in the agreement, paid to plaintiffs the sum of $17,000 as part of the purchase price of the land. ·Thereafter it erected a large public market building costing in excess of $100,000. In addition to the $17,000 paid, as aforesaid, the defendant later from time to time paid to plaintiff some $4,266 in accordance with the terms of the contract of purchase, but no more.

On February 4, 1931, the plaintiffs served upon defendant a notice of forfeiture of its rights under the contract, but did not tender or offer to return to defendant the amounts paid by it under such contract, nor to pay it for the value of the improvements. After the service of such notice, plaintiffs stated, in substance, to defendant that their purpose was to enforce the payment of certain interest then due and in arrears, but that they were desirous of protecting the stockholders of defendant, if possible, and, if possession of the building was surrendered, they would collect the rents therefrom and apply them in discharge of the indebtedness owed on account of the interest. Relying on such representations, the vice-president of defendant surrendered possession of the premises, but the plaintiffs, although collecting rents, did not account for any of the money so collected, but have since treated the property as their own, and brought suit to quiet title thereto. It is then alleged that this conduct amounted to a rescission of the contract by plaintiffs, and defendant asked for judgment for the amount paid on the purchase price by

it, together with the value of the improvements. The pleading which we have summarized is entitled "answer and cross complaint," and the question is whether or not it states a defense to plaintiffs' complaint to quiet title.

The position of defendant, as set forth in its brief, is that the contract in question provided for a lease with an option of purchase, and that it, within the time set forth in the contract and in accordance with the terms thereof, did exercise its option, by paying to the plaintiffs the $17,000 required to be paid as first payment on said option, and thereby the status of the defendant was changed, from that of a mere lessee and optionee in possession, to that of a purchaser in possession under a contract of bargain and sale, with all the rights arising from such status, and that plaintiffs' subsequent conduct was as a matter of law a rescission of the contract, with all the usual consequences thereof.

It is the contention of plaintiffs, on the other hand, that the instrument was originally a lease and an option of purchase, and that after the payment of the $17,000, while the lease was terminated, it still remained a mere unilateral option, which defendant could complete or not as it saw fit, and was subject to the terms of section 5 of the contract in regard to forfeiture, and that, even if it had become a contract of bargain and sale, they did not rescind, but were attempting to enforce their rights under the contract.

The first question then is, What was the status of the parties at the time plaintiffs took possession of the property in 1931? This court has considered several times the difference between a mere option of purchase and an agreement of bargain and sale. In this jurisdiction we have held that the best test is whether or not it binds the optionee to pay the purchase price. *Treadway* v. *Western Cotton Oil &*

*Ginning Co.*, 40 Ariz. 125, 10 Pac. (2d) 371; *Armstrong* v. *Irwin*, 26 Ariz. 1, 221 Pac. 222, 32 A. L. R. 609; *Harper* v. *Independence Development Co.*, 13 Ariz. 176–179, 108 Pac. 701.

It is of course obvious that, before the payment of the $17,000 the agreement was simply a lease and option to purchase, and that defendant could not have been compelled to exercise its option, or pay any portion whatever of the purchase price of $57,000. If the payment made no change in the status of the parties, under section 5, *supra*, of the contract, when any default in payments occurred all rights of the lessees were forfeited and the lessors could resume possession, without any repayment of any sums which might have been paid by the lessees as rent or for the erection of improvements. What, if any, effect had the payment of the $17,000? We think that the contract, so far as the option is concerned, may be summed up as follows: Plaintiffs said to defendant:

"You are going into possession of our property under a ten year lease. We will give you an option to purchase it for $57,000.00 and you shall have thirty months in which to determine whether or not you will exercise such option. If you conclude to exercise it, you may pay for the property in the following manner: $17,000.00 at the time you do so and the balance within ten years, with interest at seven per cent., but the option shall be null and void if you fail to carry out all of your agreements to which you have bound yourself."

Defendant therefore went into possession of the premises under a lease, with thirty months to determine whether it would exercise an option to purchase the property for a stated price, and on definite terms, and with the further provision that its option would be void if it did not carry out all of the conditions of the lease which it had agreed to perform. At that time the only thing which it had agreed to do was to

pay the rental of $38,000, together with taxes and certain insurance. If it did this, its option lasted for thirty months. If it failed to do this for even one month, although the thirty-month period had by no means expired, it lost its option to purchase the premises without further ado.

What would have been the legal effect if defendant, at any time within the thirty months, and while the rental, taxes, and insurance, as aforesaid, were fully paid, had notified plaintiffs formally that it intended to exercise its option of purchase? The acceptance within the time specified of an option of purchase of land and compliance with the conditions precedent, if any, changes the option into a contract of sale binding upon both parties. *Smith* v. *Bangham*, 156 Cal. 359, 104 Pac. 689, 28 L. R. A. (N. S.) 522; *Chadsey* v. *Condley*, 62 Kan. 853, 62 Pac. 663; *Boyden* v. *Hill*, 198 Mass. 477, 85 N. E. 413; *Jones* v. *Barnes*, 105 N. Y. App. Div. 287, 94 N. Y. Supp. 695; *Frank* v. *Stratford-Handcock*, 13 Wyo. 37, 77 Pac. 134, 110 Am. St. Rep. 963, 67 L. R. A. 571. Such acceptance completes the contract, exhausts the option, and estops the purchaser from subsequently repudiating it or choosing the other alternative. *Castle Creek Water Co.* v. *Aspen*, (C. C. A.) 146 Fed. 8, 8 Ann. Cas. 660. This is equally true of a lease with option to purchase. *Monihon* v. *Wakelin*, 6 Ariz. 225, 56 Pac. 735; *Swanston* v. *Clark*, 153 Cal. 300, 95 Pac. 1117.

We think the payment of the $17,000 was in legal effect a notification by defendant to plaintiffs that it intended to and had exercised its option, and by their acceptance thereof the option became a contract of purchase and sale binding upon both parties. Thereafter the plaintiffs could not have refused to convey upon the tender of the balance of the purchase price, and the defendant could have been sued for such balance, had it neglected or failed to make the

payments. Since the lease was terminated by the exercise of the option, the parties no longer occupied the status of lessors and lessee, but that of vendors and purchaser, under an executory contract of purchase and sale.

Was there any provision of the contract declaring time of the essence of the contract or providing for the forfeiture of payments already made on default of the purchaser, or granting to the vendor any special rights not given as a matter of law to a vendor, under circumstances like those found herein? The provisions of section 5 do not apply, for all through it refers to the parties as lessors and lessee and provides for forfeiture of the "lease" and the "right to exercise the option of purchase herein." We think that after the option to purchase had been exercised and the lease had terminated, these provisions, having fulfilled their purpose, were at an end. Nor is the last portion of section 6 applicable, for it merely provides that the "option" shall be null and void under certain circumstances, and, the option having been transformed into a binding contract of purchase and sale, the necessity for or the applicability of such provision had also passed away. The only material parts of the original contract remaining in force were those of section 6 in regard to the payment of the purchase price, with interest, and the agreement of section 8 that upon full payment the vendors would execute a warranty deed in favor of defendant.

What, then, is the situation where, after the parties have entered into a binding contract of purchase and sale and possession has been given to the vendee, the latter defaults in his payments and there is no special provision in the contract that time is the essence thereof, or as to what shall be done after default? We think the correct rule is laid down in the case of *Glock* v. *Howard & Wilson Colony Co.,* 123

Cal. 1, 55 Pac. 713, 716, 69 Am. St. Rep. 17, 43 L. R. A. 199, as follows:

" . . . The equitable rule where time is not of the essence is succinctly stated in section 1492 of the Civil Code. . . . Upon the other hand, after the vendee's breach of the covenant to pay, what are the vendor's rights? First, to stand upon the terms of his contract, and sue for its breach under section 3307 of the Civil Code; second, still resting upon the contract, he may remain inactive, yet retain to his own use the moneys paid by the vendee, so that it is of no moment whether or not the contract declares that such moneys shall upon the breach be forfeited as liquidated damages; third, going into equity, still upon his contract, he may seek specific performance, . or, finally, if his generosity prompts him so to do, he may agree with the vendee for a mutual abandonment and rescission, in which last case, and in which last case alone, the vendee in default would be entitled to a repayment of his money. One thing more he may do, but this is rather incidental to the fact that he has made the contract than a right growing out of it. It has heretofore been said that in certain cases equity will relieve the vendee from the effect of a breach of his covenant to pay upon a day certain. When such relief is granted, it is only after a showing of fraud, mistake, surprise, or other ground of purely equitable cognizance, excusing the breach. Now, as the vendee in default may maintain such an action, so may the vendor call the defaulting vendee into a court of equity, and compel him to show why all his rights under the contract should not be held to be at an end. The vendor, when he prosecutes such an action, does so to cut off the possibility of any future claim by the vendee to equitable relief, which might embarrass or cloud his title. In some forums this is designated an action for rescission. With us it is commonly called an action to foreclose the vendee's rights. . . . ''

Which of these alternatives does the answer and cross-complaint allege plaintiffs elected? It is the position of defendant that the facts show the election

was one of rescission of the contract. Rescission is necessarily a voluntary act, and there is no allegation that plaintiffs in so many words declared the contract rescinded, but it is contended that their acts amounted thereto. These acts, as stated in the answer, are as follows: On February 4, 1931, plaintiffs delivered to defendant a notice of forfeiture of the contract, but stated that they only intended to use that for the purpose of forcing the payment of interest. This of itself is equivalent to a declaration that plaintiffs did not intend to repudiate the contract, but on the contrary were standing on it. They then stated to defendant that, if it would surrender possession of the premises, the rentals would be applied upon the interest then long overdue. This again was obviously not a repudiation but an affirmance of the contract. The pleadings of defendant, taken in connection with the complaint, show affirmatively that at the time the notice of forfeiture was delivered there were several thousand dollars in arrears upon the interest. There is no allegation that the rentals collected were sufficient to pay interest up to the time of the filing of the suit to quiet title, nor that defendant had ever tendered payment of the amount in default. Under these circumstances we think the complaint wholly fails to show any attempt or intention on the part of plaintiffs up to the time of filing this action to rescind the contract, but rather an intention to stand thereon, unless it be held the mere giving of a notice of forfeiture where time is not specifically made of the essence of the contract, regardless of the circumstances of the case, is as a matter of law a rescission by the vendor. We have examined the cases cited on this point by counsel for defendant, such as *Gaume* v. *Sheets,* 181 Cal. 119, 183 Pac. 535; *Epplett* v. *Empire Inv. Co.,* 99 Or. 533, 194 Pac. 461, 700; *Cornely* v. *Campbell,* 95 Or. 345, 186 Pac. 563, 187 Pac. 1103, and while in some of them

the bald statement is made that an unauthorized declaration of forfeiture is in effect an attempt to rescind which, if accepted by the vendee, constitutes a mutual rescission, the facts in each case show the rule as stated is broader than required for the decision of the particular case. We think the true rule is more correctly stated in the cases such as *Pinkerton* v. *Morton,* 63 Cal. App. 471, 218 Pac. 770, *McLain* v. *Smith,* 201 Iowa 89, 202 N. W. 239, *Rea* v. *Security Trust & Savings Bank,* 129 Cal. App. 663, 19 Pac. (2d) 267, and *Oursler* v. *Thacher,* 152 Cal. 739, 93 Pac. 1007, to the effect that the test is the intention of the parties, to be determined by all their acts, and that an attempt to act in pursuance of a contract, even though the actor has mistaken its true meaning, is an affirmance rather than a rejection thereof. As was said in *Oursler* v. *Thacher, supra:*

"The stipulated facts here warrant no inference but the one that plaintiffs have done no more than to insist that, under the terms of the contract, defendants had no further rights under such contract, but had forfeited all such rights. Their notice of forfeiture and demand for possession of the mining property were strictly in line with this claim, and were in no sense a repudiation or abandonment of the contract or a consent to a rescission thereof, any more than was the refusal of the vendor to convey in *Glock* v. *Howard, supra,* an abandonment or a consent to a rescission. The bringing of the action to quiet title was an act of the same character. Practically it amounted to no more than the calling of the defaulting vendees into court to show why it should not be decreed that under the terms of the contract all their rights thereunder were at an end. In the absence of some sufficient equitable showing to excuse their failure to comply with the terms of the contract, plaintiffs, while standing on their contract, were entitled to such a decree, so as to cut off the possibility of any future claim by the vendee to equitable relief, which might embarrass or cloud his title.

*Glock* v. *Howard,* 123 Cal. 10, 11, 55 Pac. 713, 69 Am. St. Rep. 17, 43 L. R. A. 199.

"There being no rescission or abandonment of the contract by the plaintiffs, and the plaintiffs at all times have insisted on the contract and stood on its terms, and being in no respect in default, the vendees in default were not entitled to recover either the moneys paid by them to plaintiffs or the moneys expended in developing the property."

Does the commencing of the suit of itself indicate an intention on the part of plaintiffs to rescind the contract? We think the question is answered in the case of *Glock* v. *Howard, supra.* The suit to quiet title was, as stated therein, an attempt on the part of plaintiffs to cause defendant to show why their rights under the contract should not be foreclosed. If there was any legal or equitable reason excusing the failure to pay the long-overdue interest, defendants in their answer could have pleaded it, and the court would have considered it on its merits, for it is well settled that equity may under proper circumstances relieve for the failure to pay money at the precise time it is due. Defendant, however, did not offer such excuse, but assumed that the contract had been rescinded by plaintiff, and that it was entitled to a return of the purchase price already paid, together with the value of the improvements. Since, as we have held, the answer does not show there was ever any rescission intended or attempted on the part of plaintiffs, there is no right of recovery of any sums paid by defendant. It would indeed be a strange situation if a purchaser could go into possession of premises under a contract which required him to pay interest regularly, but postponed the payment of the principal for a long period, and then refuse to pay the interest without any equitable excuse therefor, and continue in possession of the premises indefinitely, with the only remedies in the hands of the vendor, a suit for the purchase price against a

debtor who was perhaps insolvent, or the privilege of paying back all the money already paid on the contract and then recovering the premises. The right last mentioned never existed at law and in equity only under certain conditions which are well set forth in 39 Cyc. 2002, as follows:

"The cases where the purchaser may maintain an action to recover back money paid by him under a contract for the purchase of real estate, where the contract has been rescinded, are: (1) Where the rescission is voluntary and with the mutual consent of the parties, and without default on either side; (2) where the vendor can not or will not perform the contract on his part; (3) where the vendor has been guilty of fraud in making the contract; (4) where, by the terms of the contract, it is left in the purchaser's power to rescind it by any act on his part, and he does so; and (5) where neither party is ready to complete the contract at the stipulated time, but each is in default."

We hold, therefore, that, when a vendee in possession under an executory contract of sale is delinquent in his payments, even though time may not be of the essence of the contract, the vendor may declare a forfeiture of the vendee's rights, recover possession of the premises, and thereafter bring a suit to quiet title without being held *ipso facto* to have rescinded the contract, if it appears that, as a matter of fact, it was not his intention to rescind, but that in such an action the vendee may present any equitable grounds for delay in the payment which he may have, and the court may consider them in determining what judgment should be rendered. Since the answer does not set up facts constituting a rescission, and since no legal or equitable reasons for the admitted delinquency of defendant are plead therein, the trial court rightly sustained the demurrer.

Judgment affirmed.

ROSS, C. J., and McALISTER, J., concur.